IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| 1410 ORCHARD STREET LLC, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 120108 |
| | ) | |
| v. | ) | |
| | ) | |
| LANE COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the real market value of property identified as Account 0291813 (subject property) for the 2011-12 tax year. A telephone trial was held on September 26, 2012. David E. Carmichael, Attorney at Law, appeared on behalf of Plaintiff. Barry Mahlberg (Mahlberg), principal in Plaintiff, and Corey S. Dingman (Dingman), MAI, testified on behalf of Plaintiff. Roxanne Gillespie (Gillespie), MAI, appeared and testified on behalf of Defendant. Plaintiff's Exhibit 1 and Rebuttal Exhibit 1 were received without objection. Defendant's Exhibits A, B, C, and D and Rebuttal Exhibits A, B, and C were received without objection.

I. STATEMENT OF FACTS

The subject property is a five-story, mixed-use apartment complex located in Eugene, Oregon, near the University of Oregon (University) campus. (Ptf's Ex 1 at 5.) The subject property improvements total "51,306 square feet of gross building area (GBA), with 45,210 square feet of rentable housing area and 2,121 square feet of net rentable commercial area[.]" (*Id.* at 45.) The subject property includes four floors of apartments with 16 three-bedroom/two-bathroom units, 24 four-bedroom/two-bathroom units, and seven four-bedroom/three-bathroom units. (*Id.* at 5.) The subject property common areas total 3,975 square feet and include an

"entry lobby"; "resident commons"; "media room"; "secured bike storage"; and "other." (*Id*. at 45.)

"The apartments offer such amenities as washer/dryers, dishwashers, private open space, and on-site vehicle parking for 35 vehicles[.]" (*Id.* at 29.) "Each unit is separately metered for utilities, including electricity and water. The building is served by an elevator and videophone entry system, coded key fob access and video monitoring of public spaces." (*Id*. at 45.) "The kitchen appliances in each unit include a freestanding or slide-in range/oven, hood light/fan, refrigerator, dishwasher and garbage disposal." (*Id.* at 46.) The "building attained the LEED Gold certification for the inclusion of energy conserving and environmentally-friendly building features and the use of sustainable building practices." (*Id* at 45.) Mahlberg testified that LEED Gold certification reduces certain utility expenses, but increases other expenses.

The subject property lot is 0.44 acres or 18,939 square feet. (*Id.* at 5.) It "is located on the east side of Eugene" in "the Walnut Station Special Area Zone (S-WS Zone)." (*Id.* at 26.) "The S-WS Zone houses a largely transient student population. The 2010 census reflects a median household income for the residents of the S-WS Zone at $13,639." (*Id.*) Plaintiff purchased the subject property land in December 2009 for $1,130,000. (*Id.* at 29.) Mahlberg testified that the subject property improvements were completed as of August 2010 and offered for lease in September 2010. (*See id*. at 30.) Dingman concluded that, "[o]verall, the apartment units are average-plus quality and in effectively new condition. As of the date of value, the improvements were essentially new." (*Id.* at 47.)

Mahlberg testified that the subject property is located on the east side of the University near the Matthew Knight arena. Dingman testified that the east side of the University campus is a new location for student housing so it is not yet as desirable as the west side of campus.

Dingman stated that "[r]ent levels for residential properties in the campus area are of the highest in the Eugene/Springfield metropolitan area on a per square foot basis. * * * The vacancy rate is consistently the lowest in the area." (Ptf's Ex 1 at 26.) Dingman described historical enrollment at the University and its effect on demand for multi-family housing:

> "For the 20 years between 1980 and 2000, UO's total enrollment averaged 17,000 students. Total enrollment in 2009 was 22,386 students, and enrollment has been at or near that level since 2001. The continued high enrollment has had a positive influence on properties catering to the student population * * *. Typically, units closest to the campus rent for more than units further from campus, all else equal.

> "Along with the construction of new units, quality and amenities of individual units and entire complexes have improved to meet the demand of renters. The newest and highest-quality apartments have benefited from the highest rents, rapid absorption, very low vacancy and low turnover costs, making them more economically productive than older and lesser-quality projects."

(*Id.* at 54.) University enrollment was 23,389 in 2010. (*Id.* at 26.) For apartment complexes in the University area completed between 2003 and 2010, absorption was "almost immediate[] when construction was completed, particularly if the units were ready to occupy between June and September[.]" (*Id.* at 55.) "The most successful complexes were those that offered popular amenities such as washers and dryers within the units and on-site parking." (*Id.*)

Mahlberg testified that, as of December 31, 2011, the subject property's actual income was $1,265,000, which is less than the income concluded in both Dingman and Gillespie's appraisals. He testified that, for the 2010-2011 school year, actual rent per unit ranged from $1,800 to $2,600.[1] (*See* Def's Rebuttal Ex A (rent rolls).) The subject property expenses, not including property taxes, were 28.19 percent of effective gross income. (Ptf's Rebuttal Ex 1.) Mahlberg testified the subject property management expenses are higher than is typical because

---

[1] Mahlberg testified that, in 2010, Plaintiff entered into an agreement with the University to lease beds for a nine-month term to freshmen; that agreement terminated after the 2010-2011 school year. He testified that units rented to freshman in 2010-2011 were "full service" so more rent was received by Plaintiff. The November 2010 rent roll for the subject property indicates that some units were rented at $2,850. (*See* Def's Rebuttal Ex A.) Mahlberg testified that $2,850 is for three months rent; monthly rent at that rate is $950.

increased supervision is required and because roommates must be paired. He testified that, as expenses for management are reduced, expenses for security, maintenance, and leasing increase.

Mahlberg testified that the subject property was initially leased on a "per unit" basis, but was subsequently leased on a "per bed" basis, similar to a college dormitory. He testified that "per unit" leases are good for smaller, one- or two-bedroom units, but "per bed" leases are better for properties with three- and four-bedroom units. Mahlberg testified that Plaintiff initially hired a "local" property manager, but he was not able to lease "all 172 beds in the first year." He testified that, during the "first year," there were issues pertaining to late rent payments and vandalism. Mahlberg testified that, as a result, Plaintiff hired "Campus Advantage" in January 2011; it is a national company with extensive experience in property management of university housing. Mahlberg testified that the subject property was fully leased as of September 2011.

"Campus Advantage has a contract with the owner for professional management at a fee of 4.2% of collected rents." (Ptf's Ex 1 at 80.) Mahlberg testified that Campus Advantage employs a general on-site manger that lives at the subject property as well as a leasing manager and three "community assistants," who are students compensated with free rent.[2] (*See id*.) Mahlberg testified that Campus Advantage provides accounting, a website, credit checks, roommate matches, and application review, all of which are administrative costs.

The subject property also includes "ground floor retail space," which is comprised of two spaces: one is 1,304 square feet and the other is 817 square feet. (*Id.* at 5, 45.) Dingman testified that the commercial space was required for the S-WS zone; it probably would not have been constructed if it were not required. (*See id.* at 32.) He testified that the subject property commercial space was slow to lease. As of January 1, 2011, "the commercial space was vacant

---

[2] Dingman's appraisal report states four community managers. (Ptf's Ex 1 at 80.)

and the apartments were approximately 85% occupied." (Ptf's Ex 1 at 29.) Mahlberg testified that the subject property offers 35 parking spaces which were offered for rent at $25 per space as of January 1, 2011. (*Id.* at 78.) Dingman testified that the subject property parking is "minimal code parking" for the zone and that is typical for student housing. (*See id.* at 47, 53-54.)

Dingman, MAI, testified that he has 30 years of appraisal experience and specializes in appraising apartments. He completed an appraisal of the subject property as of January 1, 2011. (*Id.* at 1.) Dingman testified that, for purposes of his appraisal, he assumed that the subject property was stabilized as of January 1, 2011. He testified that the difference between his stabilized and as-is values as of January 1, 2011, was about $160,000.

Gillespie, MAI, testified that she has been a certified general appraiser in Oregon since 1985 and is now interim appraisal manager for Defendant. She concluded a real market value of $13,500,000 for the subject property, but requests that the 2011-12 roll values be sustained.

The 2011-12 roll real market of the subject property was $13,027,857, with $1,130,955 attributed to the land and $11,896,902 to the improvements. (Ptf's Compl at 2.) The 2011-12 exception real market value of the subject property was $11,916,267 and the maximum assessed value was $7,272,395. (*Id.*) Plaintiff requests that the 2011-12 real market value of the subject property be reduced to $11,280,000. Plaintiff requests that the 2011-12 exception real market value be reduced in accordance with the 2011-12 improvements real market value. Defendant requests that the 2011-12 roll real market value and exception value be sustained.

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2011-12 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL

21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real

market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."[3]

The assessment date for the 2011-12 tax year was January 1, 2011. ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in

accordance with rules adopted by the Department of Revenue[.]" ORS 308.205(2); OAR 150-

308.205-(A)(2)(a). There are three methods of valuation that must be considered, although all

three may not be applicable in every case: (1) the cost approach, (2) the sales comparison

approach, and (3) the income approach. OAR 150-308.205-(A)(2)(a); *see also Allen v. Dept. of

Rev.* (*Allen*), 17 OTR 248, 252 (2003). The value of property is ultimately a question of fact.

*Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted).

Plaintiff has the burden of proof and must establish its case by a preponderance of the

evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of

evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

"[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his

burden of proof." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has

jurisdiction to determine the real market value or correct valuation on the basis of the evidence

before the court, without regard to the values pleaded by the parties." ORS 305.412.

/ / /

/ / /

---

[3] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

A.	*Highest and best use*

Highest and best use is generally the starting point for any appraisal. " 'Highest and best use' means the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible, and that results in the highest value." OAR 150-308-205-(A)(1)(e); *see also* Appraisal Institute, *The Appraisal of Real Estate* (*Appraisal of Real Estate*) 277-78 (13th ed 2008). Dingman stated that, "in the campus market, * * * rents are at an all-time high and vacancy is at an all-time low. New, high-quality units enjoy the highest demand, typically have waiting lists for available units, and achieve full-year leases." (Ptf's Ex 1 at 52.) As of the date of Dingman's report, several new apartments were recently developed or under construction. (*Id.* at 52-54.) He observed that market demand was highest for studios and one-bedroom units, as well as "two- and three-bedroom units, particularly those with 1.5 to two baths." (*Id.* at 52.) Dingman and Gillespie both concluded that the subject property as improved is the highest and best use. (*Id.* at 53; Def's Ex A at 18.)

B.	*Cost approach*

" 'In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes.' " *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006) (citations omitted). "The [cost] approach is especially persuasive when land value is well supported and the improvements are new or suffer only minor depreciation and, therefore, approximate the ideal improvement that is the highest and best use of the land as though vacant." *Appraisal of Real Estate* at 382; *see also Magno*, 19 OTR at 55. "The principle of substitution is basic to the cost approach. This principle affirms that a knowledgeable buyer would pay no more for a property than the cost to

acquire a similar site and construct improvements of equivalent desirability and utility without undue delay." *Appraisal of Real Estate* at 380.

Dingman and Gillespie both used the sales comparison approach to determine the subject property land value and, based on their comparable sales, concluded that the purchase price of $1,130,000 for the subject property land was supported. (Ptf's Ex 1 at 62; Def's Ex A at 21.) The court agrees and finds that the subject property land real market value was $1,130,000.

For the improvements, Dingman relied on the subject property developer's actual cost of $7,509,040, "which include[d] all direct (hard) costs of construction for the mixed-use building and associated site improvements." (Ptf's Ex 1 at 62, 92-93.) He testified that he reviewed one other project near the University and it reported similar costs. Dingman testified that he relied on "market costs" for financing, entrepreneurial incentive, and soft costs. He used 7.5 percent of "budget hard costs," or $563,178, for "[s]oft (indirect) costs of construction, such as architect and engineering fees, System Development Charges (SDCs), permits and inspections * * *." (*Id.* at 62.) Dingman added financing costs of 5 percent ($403,611) and entrepreneurial incentive of 15 percent ($1,458,799), for a value conclusion of $11,180,000, rounded. (*Id.* at 64-66.) Using Marshall and Swift, Gillespie determined a total improvement cost of $10,590,633, including three percent soft costs and ten percent entrepreneurial profit. (Def's Ex A at 22.) She concluded a total real market value of $11,721,618 under the cost approach. (*Id.*)

Although Dingman considered both his "land value estimate" and his "replacement cost new" estimate to be "supported," he gave the cost approach "limited consideration," finding it to be "weakened" due to limited market data to estimate depreciation and the entrepreneurial incentive. (Ptf's Ex 1 at 86.) Gillespie gave little weight to the cost approach because the subject property was "constructed for investment return." (Def's Ex A at 27.) The subject

property land value is supported by the recent purchase and the subject property improvements were new as of January 1, 2011. Thus, the court finds that some weight should be given to the cost approach. The court further finds that both Dingman and Gillespie's value conclusions under the cost approach, $11,180,000 and $11,721,618, respectively, are supported by the evidence. The court is unable to reconcile those value conclusions and finds that the real market value indicated by the cost approach likely lies in between those values.

C.    *Sales comparison approach*

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). The "court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson*, TC-MD 020869D, WL 21263620 at *3 (April 3, 2007). OAR 150-308.205-(A)(2)(c) states:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length transactions."

Dingman identified five comparable sales located near the subject property that sold close to the January 1, 2011, assessment date. (Ptf's Ex 1 at 68-69.) The properties are all smaller than the subject property, ranging in size from 6 to 20 units and from 5,058 to 32,372 net rentable square feet. (*Id.* at 69.) Dingman testified that sales 1, 2, and 3 are newer properties and sales 4 and 5 are mixes of older and newer (renovated). (*See id.* at 69.)

Dingman testified that price "per bed" was more helpful as a unit of value than price "per unit," noting that price "per unit" value yields a wider range of values. (*Id.* at 67.) His newer comparable sales indicated "per unit" prices of $245,000 to $375,000 and "per bed" prices

ranging $68,600 to $78,125. (Ptf's Ex 1. at 70-71.) Dingman stated that those "complexes generate similar gross income per bedroom, but have lower expense ratios, which make the indicated values slightly high for the subject [property]." (*Id.* at 71.) He concluded $250,000 per unit or $68,314 per bed for a total value of $11,750,000 under the sales comparison approach. (*Id.*) Dingman stated that his value conclusion "reflects the contributory value of the commercial space." (*Id.*)

Gillespie testified that there were very few sales of newly-constructed properties around the assessment date; she identified only two comparable sales. (Def's Ex A at 23.) Gillespie's comparable sales were located close to the University, built in 2008, and were of "good" quality and "good" condition. (*Id.*) One property included 14 units and sold for $255,357 per unit. (*Id.*) The other property had 20 units and sold for $375,000 per unit. (*Id.*) Gillespie determined a unit price of $300,000 for the subject property for a total real market value of $14 million. (*Id.*) Plaintiff questioned why "RLID [Regional Land Information Database]" does not include a record of either of Gillespie's sales. (Ptf's Rebuttal Ex 1 at 5-6 ("no record" result for properties located at 1372 Patterson Street or 1893 Alder Steet).) It appears that Gillespie's two comparable sales are likely the same sales identified by Dingman as sales 2 and 3: respectively, "The Commons on Alder" and "Patterson Place" apartments. (Ptf's Ex 1 at 69-70; Def's Ex A at 23, 38-39.) It is unclear why the addresses differ.[4]

Dingman testified that he considered the sales comparison approach to be the weakest approach given a lack of comparable properties available for purchase. (*See* Ptf's Ex 1 at 67.) Although she identified only two comparable sales, Gillespie considered the sales comparison

---

[4] Gillespie reported the per unit sale price of Patterson Place as $255,357. (Def's Ex A at 23.) However, Dingman adjusted the sale price of Patterson Place to $245,000 per unit due to the "MUPTE," or multi-unit property tax exemption. (Ptf's Ex 1 at 69; *see also* Def's Ex A at 38.)

approach to be "reliable" in this case and gave it "equal weight." (Def's Ex A at 27.)

The court finds that the sales comparison approach should be given little weight in this analysis. The subject property is a mixed-use property and neither Dingman nor Gillespie were able to identify recent sales of mixed-use properties. (*See, e.g.,* Ptf's Ex 1 at 67.) Furthermore, the sales identified by Dingman and Gillespie all involve properties smaller than the subject property both in terms of overall square feet and number of units; thus, the subject property is not bracketed in size. Of the sales identified, the court finds that Dingman's three newer sales, two of which appear to be the sales used by Gillespie, are the most similar to the subject property. Dingman concluded a unit value of $250,000, or $68,314 per bedroom. (*Id.* at 71.) That conclusion appears low, particularly in light of the fact that the resulting per-bed unit price is lower than any of the three newer comparable sales identified by Dingman. The court finds that a per-bed price of $73,250 is supported for the subject property as of January 1, 2011. At 172 bedrooms, that price indicates a real market value of $12,600,000, rounded.

Gillespie also considered a gross income multiplier approach and compared properties on the basis of net operating income (NOI) per unit. (Def's Ex A at 23.) Plaintiff criticized Gillespie's reliance on NOI per unit and a gross income multiplier. Dingman testified that the gross income multiplier is "an income-based method" because it compares properties based on income produced. (*See* Ptf's Ex 1 at 67.) He testified that it is often used by brokers for smaller properties, but it is not a good indicator of value of the subject property. Plaintiff provided an excerpt from *The Appraisal of Real Estate* stating:

> "Prices of comparable properties are not usually adjusted on the basis of differences in [NOI] per unit because rents and sale prices tend to move in relative tandem. A value indication developed using NOI per square foot as a unit of comparison is not independent of a value indication developed using direct capitalization, which negates the checks and balances provided by using more than one approach to value. In effect, the results suffer from circular logic."

(Ptf's Rebuttal Ex 4; *Appraisal of Real Estate* at 305.)  The court agrees that NOI per unit and the gross income multiplier method are not helpful in this analysis.

D.     *Income approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces."  *Allen*, 17 OTR at 253 (citations omitted).  "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) [NOI.]"  *Id.*  "NOI is the currently expected net income of a property after all operating expenses are deducted from gross income.  To calculate the NOI, appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data."  *Id.* at 254 (citation omitted).

1.     *Potential gross income*

Dingman testified that, as of January 1, 2011, most of the subject property units were rented on a "per unit" basis, but managers considered rent in terms of "per bed" rent, so he determined market rent on a "per bed" basis.  Mahlberg testified that the subject property actual rents as of 2010-2011 school year ranged from $1,800 to $2,600 per unit.  (Def's Rebuttal Ex A.)

Dingman identified four comparable apartment complexes located near the University that were built in 2009 or 2010 and ranged in size from 8 to 20 units.  (Ptf's Ex 1 at 75-76.) During the 2010-2011 school year, Dingman's apartment comparables leased at rates ranging from $615 to $650 per bed with tenants paying all utilities.[5]  (*Id.* at 76-77.)  Dingman stated:

> "The subject units are much smaller than the comparable[s] and if compared on a
> rent per square foot basis, the subject would reflect rents in the $525-$550 per

/ / /

---

[5] Dingman noted that "[g]eneral pricing for bedrooms in the older facilities [built in the 1950s through the 1970s] has been in the $450 to $600 per bedroom range.  Tenants appear to be willing to pay the additional $100 per month per bedroom (on average) for the newer units[.]"  (Ptf's Ex 1 at 57.)

bedroom range. * * * However, the subject [property] is managed unlike any of the other complexes on campus and offers a high degree of amenities."

(*Id*. at 77.) "As of the date of value, the subject units were rented for rates of $595 [to] $650 per bedroom. Some units were rented at higher rates due to inclusion of utilities and 9-month lease rates." (*Id*. at 78.) Dingman nevertheless analyzed market rent "based on a full year lease with the tenant responsible for utilities." (*Id*.) He concluded market rent for the subject property of $650 per bed for the three-bedroom units and $625 per bed for the four-bedroom units. (*Id*.)

Gillespie testified that she considered both actual and market rent. (Def's Ex A at 24-25.) She identified five apartment complexes of a similar age, quality, class, and condition as the subject property with rent ranging from $1,695 to $1,900 per unit for three-bedroom units and rent ranging from $2,380 to $2,430 for four-bedroom units.[6] (*Id*. at 25.) Gillespie concluded rent of $1,850 for three-bedroom units and rent of $2,600 for four-bedroom units. (*Id*. at 24.)

"The income approach should be based on enough historical data so that a normalized expected income can be determined with confidence. Most experts believe that three to five years, preferably longer, of income experience are needed to make such an estimate." *Confehr v. Multnomah County Assessor* (*Confehr*), TC-MD No 110621D, WL 659199 at *8 (Feb 27, 2012) (citing *Bauman et al v. Dept. of Rev.*, 6 OTR 426, 433 (1976) (citations omitted)). The subject property apartments were first offered for rent in September 2010; thus, three to five years of income experience is not available. However, as Dingman discussed in his report, demand for multi-family housing hear the University was strong as of January 1, 2011. (*See* Ptf's Ex 1 at 55.) Rents were "at an all-time high and vacancy [was] at an all-time low"; absorption of new properties was "almost immediate[] when construction was completed." (*Id*.) Market demand is

---

[6] Gillespie did not identify "per bed" rent for each of her comparable apartments. One of Gillespie's comparable apartment complexes, the "Patterson Place Apartments," reportedly received average rent per bedroom of $602.50 in 2010 and will increase to $627.50 in 2011. (Def's Ex A at 38.)

expected to grow as enrollment at the University increases and Dingman identified other projects under development as of the date of his report. (Ptf's Ex 1 at 56.) Based on the actual rents for the subject property apartments, the rent comparables identified by Dingman and Gillespie, and the market demand, the court finds that the subject property apartments will achieve rents at the high end of the market: $650 per bed, or $1,950 per unit for the three-bedroom units and $2,600 for four-bedroom units.

Dingman testified that the subject property is not a desirable commercial space because it lacks parking in front and it is not located in a high traffic area. The commercial spaces in the subject property "were provided in gray shell condition, with services stubbed to the spaces but no interior finishes such as wall coverings, ceilings, lighting, etc." (*Id.* at 46 (emphasis omitted).) Plaintiff leased the 1,304-square-foot[7] commercial space "beginning in September 2011 for a 5-year term" for about $1.85 per square foot per month. (*Id.* at 74.) That lease included $95 per square foot, or $127,490, in tenant improvements that, if amortized over the life of the lease, result in effective rent of $1.58 per square foot per month. (*See id.*) The second commercial space in the subject property had not leased as of the date of Dingman's report and was "occupied by the managements leasing company." (*Id.*)

Dingman identified three comparable leases of ground floor commercial space with rates ranging from $1.05 to $2.23 per square foot per month. (*Id.* at 72-74.) Based on those leases, he concluded rent of $1.50 per square foot per month, triple net, for the subject property "gray shell" commercial space. (*Id.* at 74.) Gillespie identified six rent comparables for the subject property commercial space with actual rents ranging from $2.50 to $3.74 per square foot per

///

---

[7] Ptf's Ex 1 at 74 refers to the "1,342-square-foot" commercial space, but Ptf's Ex 1 at 45 describes it as "1,304 square feet."

month in 2010. (Def's Ex A at 26.) She determined market rent of $1.90 per square foot per month for the subject property commercial spaces. (*Id.* at 24.)

The court is persuaded by Dingman's analysis that the subject property commercial space is less desirable due to its location and lack of parking. It is noteworthy that all of Gillespie's commercial rent comparables had significantly higher land to building ratios than the subject property. (*Id.* at 26.) Based on the lease comparables identified by Dingman and the subject property actual lease, the court finds market rent for the subject property commercial space was $1.58 as of January 1, 2011.

Dingman used actual rent of $25 per space per month for the subject property parking. (Ptf's Ex 1 at 78.) He testified that, at the time of his report, there was no separate market for apartment parking and he did not complete a rent study of the market for parking spaces. Dingman testified that he considers the subject property parking to be an amenity for tenants. He testified that it did not seem appropriate to look at rent for parking in separate lots or garages; those are in a different market than the subject property. Gillespie testified that, based on a parking market survey, she determined that reasonable rent for parking was $60 per space. (Def's Ex A at 24; *see also* Def's Rebuttal Ex C at 1.)

The court is persuaded by Dingman's analysis that the subject property parking is an amenity for tenants and there is no separate market for the subject property parking. There is no evidence that the subject property parking spaces are leased or could be leased to anyone other than tenants. The court finds that the actual parking rent of $25 per month is supported.

Based on the market rent conclusions stated above, the court finds potential gross income of $1,352,100 for the subject property apartments and parking; potential gross income of $40,214 for the subject property commercial space; and total potential gross income of $1,392,314.

2.    *Vacancy, effective gross income, expenses, and net operating income*

Dingman and Gillespie both utilized a five percent market vacancy rate in their analyses. (Ptf's Ex 1 at 78-79; Def's Ex A at 24.) Dingman stated that "[t]he subject [property] will also receive additional income in the form of expense reimbursements for the commercial spaces. * * * Income from the expense reimbursements is calculated using the square footage of the commercial area and the stabilized occupancy of 95%." (Ptf's Ex 1 at 79.) He calculated additional income of $10,000 after vacancy. (*Id.* at 79-80.)  The court agrees that a five percent vacancy rate is supported and finds effective gross income of $1,284,495 for the subject property apartments and parking; effective gross income of $48,203 for the subject property commercial space;[8] and total effective gross income of $1,332,698.

Excluding property taxes, Dingman estimated total expenses of $365,139 for the subject property, or 28.18 percent of effective gross income. (Ptf's Rebuttal Ex 1 at 1.) His expense estimate includes: a charge for the "Eugene Rental Housing Code"; insurance; utilities for common spaces; trash removal; annual maintenance; "turnover"; miscellaneous expenses; and reserves for replacement. (*Id.*; *see also* Ptf's Ex 1 at 80-82.) Dingman's largest expense was $200,000 for "stabilized management and administrative cost," which included $114,419 for personnel and $53,796 for "general and administrative expenses." (Ptf's Ex 1 at 80-81.)

Dingman acknowledged that his expense estimate for the subject property is "above market standards of $2,500 to $4,500 per apartment unit for older campus apartments * * *." (*Id*. at 82.) He testified that the subject property is a "slightly different product" than many other properties near the University because it includes a staffed front desk and other amenities. Dingman explained that "the subject [property] is designed and built as a complex that will

---

[8] Effective gross income for the subject property commercial space is potential gross income, less five percent vacancy, and with an additional $10,000 of expense reimbursements calculated by Dingman.

require a higher degree of management. There are no other properties in the Eugene market that require the same degree of management as the subject."[9] (*Id.* at 80.) Dingman testified that the subject property turnover expense is higher because the subject property is brought to a better condition at turnover than many other units near the University; that is an expectation of parents putting their freshman children in the subject property apartments.

Gillespie testified that she used 20 percent expenses for the subject property apartments. (*See* Def's Ex A at 24.) In support of her expense conclusion she provided the "Expense Comparables Survey responses" from "2008-2010" indicating average total operating expenses of 25 percent and average management expenses of seven percent. (Def's Rebuttal Ex B at 2.) Gillespie also provided an "Expense Comparison" detailing expense rates for four apartment complexes built between "1941 2004" and 2010. (*Id.* at 1.) The apartments in the "Expense Comparison" do not appear to be the same as those used by Gillespie as rent comparables, with the possible exception of the "Patterson Place Apartments." (*See id.*; Def's Ex A at 25.)

Gillespie provided information sheets for her comparable sales, which report expenses of 20 percent "Except Management & Property Taxes" and seven percent for "Management" for the "Patterson Place" apartments and expenses of 12 percent "Except Property Tax" for "The Commons on Alder." (Def's Ex A at 23, 38-39.) The Patterson Place Apartments were also used by Gillespie as a rent comparable. (*Id.* at 25.) Plaintiff noted that the "Patterson Place" apartments are exempt from property taxes on the improvements for 10 years because of a "MUPTE" (Multi-Unit Property Tax Exemption). (*See id.* at 38.)

Although the subject property expenses are high for the market, the court is persuaded that a 28 percent expense rate is supported, particularly in light of the fact that the subject

_____

[9] The expense ratios of Dingman's comparable sales ranged from 21.2 to 35.0 percent. (Ptf's Ex 1 at 83.)

property achieves rents at the high end of the range for the University housing market. Plaintiff presented persuasive evidence that the subject property achieves those rents as a result of its management. The court also notes that the "Patterson Place" apartments, relied on by both Dingman and Gillespie, reportedly incurs expenses totaling 27 percent of effective gross income.

It is unclear what expenses Dingman used for the subject property commercial space. However, he stated that his NOI conclusion included "expenses and [NOI] associated with the ground floor commercial spaces." (Ptf's Ex 1 at 82; Ptf's Rebuttal Ex 1 at 1.) Gillespie testified that she used five percent expenses for the commercial space because it is typically leased on a triple net basis. (*See* Def's Ex A at 24.) She testified that she relied on a retail rent study for the commercial space. (*Id.* at 26.) Plaintiff did not offer any evidence of market expenses for the commercial space and the court accepts Gillespie's expense rate of five percent as reasonable. The court concludes NOI of $924,836 for the subject property apartments and parking; NOI of $45,793 for the subject property commercial space; and total NOI of $970,629.

3.       *Capitalization rate*

"A cap[italization] rate is generally calculated using market sales. Slight deviations in cap[italization] rates profoundly change the estimated value of a property, making the proper calculation of the rate of paramount importance." *Allen*, 17 OTR at 260. Dingman relied on his comparable sales to determine an appropriate capitalization rate for the subject property. (Ptf's Ex 1 at 82-84.) Those sales indicated capitalization rates ranging from 6.3 to 7.5 percent. (*Id.* at 83.) Dingman concluded that the capitalization rate for the subject property would be 7.25 percent. (*Id.* at 84.) He concluded an overall rate of 8.33 percent with the property tax rate for real market value of $11,170,000 under the income approach. (Ptf's Rebuttal Ex 1 at 1.)

/ / /

Gillespie selected a capitalization rate of 7.00 percent based on her two comparable sales with rates of 6.72 and 7.29 percent. (Def's Ex A at 23-24.) Adding the tax rate, Gillespie used an overall rate of 8.07 percent, for a total real market value $13,300,877. (*Id.* at 24.) Plaintiff argued that the 6.72 percent capitalization rate for the Patterson Place apartments was low because of the "MUPTE." (*See id.* at 23, 38.) The court finds that a capitalization rate of 7.25 percent and overall rate of 8.33 percent, as concluded by Dingman, is supported. The court finds that the income approach indicates a real market value of $11,652,200, rounded.

E.      *Reconciliation*

The court agrees with Dingman and Gillespie that the income approach should be given the most weight in the analysis because the subject property is an income-producing property. (Ptf's Ex 1 at 86; Def's Ex A at 27-28.) Because the subject property improvements were new as of January 1, 2011, and the land value is well-supported, the court gives secondary weight to the cost approach. For the reasons discussed above, the court gives little weight to the sales comparison approach. The court finds that the 2011-12 real market value of the subject property was $11,700,000 with $1,130,000 for the land and $10,570,000 for the improvements.

### III.  CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the 2011-12 real market value of the subject property was $11,700,000 with $1,130,000 for the land and $10,570,000 for the improvements. The 2011-12 exception real market value of the subject property should be recalculated in accordance with the court's findings. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account 0291813 was $11,700,000 for the 2011-12 tax year.

/ / /

IT IS FURTHER DECIDED that the 2011-12 exception real market value of property identified as Account 0291813 should be recalculated in accordance with the court's findings.

Dated this ＿＿ day of December 2012.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Allison R. Boomer on December 24, 2012. The court filed and entered this Decision on December 24, 2012.*